GRINNELL *v.* ANDERSON.

ASSUMPSIT—WAIVER OF TORT—CONVERSION—EVIDENCE.
   Plaintiffs, piano dealers, during the absence of defendant and his family, induced a neighbor to unlock defendant's house, and placed therein a piano, claiming that defendant's wife had agreed to receive it on trial.  Defendant thereafter refused to buy the piano, or to surrender it until he should be paid for injury done by the movers to his lawn, porch, door-casing, and carpet.  He never claimed to be the owner, and never refused plaintiffs possession, except conditionally, as stated. *Held*, that, there being no contract relation, and no conversion into money, plaintiffs were not within the rule permitting the waiving of tort and maintaining of *assumpsit* in a proper case.

| | |
|---|---|
| 122 | 533 |
| 128 | 137 |
| 128 | 245 |
| 122 | 533 |
| ʙ81ɴᴡ | 329 |
| 122 | 533 |
| 153 | 83 |

Error to Shiawassee; Smith, J.    Submitted November 15, 1899.    Decided December 30, 1899.

*Assumpsit* by Ira L. Grinnell and Clayton A. Grinnell, copartners as Grinnell Brothers, against William Anderson, for the value of property alleged to have been converted

by defendant. From a judgment for defendant, plaintiffs bring error. Affirmed.

*Selden S. Miner* (*William L. January*, of counsel), for appellants.

· *John T. McCurdy* and *Fred J. Northway*, for appellee.

MOORE, J. This case was commenced by summons, in which defendant was summoned to answer the plaintiffs in a plea of trespass on the case upon promises. The case was tried before a jury, who rendered a verdict in favor of defendant. The case is brought here by writ of error.

There are 18 assignments of error, but I think it very clear that, under the case made by the plaintiffs, they are not entitled to recover in this form of action. It is their claim that, previous to the 5th of January, plaintiffs' agents had called at defendant's home on different occasions for the purpose of selling the defendant and his wife a piano, and had talked with the wife, and had shown her the catalogue, but were unable to find the defendant at home. They called again on the 5th of January, and found his wife at home. They asked her if she thought the de-defendant would buy a piano, and she said that, if they wanted to sell the defendant a piano, the only way to do so was to bring a piano to the house, and then see him, show him the piano, and play it for him. She said he liked music, and in playing it for him, if it was satisfactory, he would undoubtedly buy it. They told her they would put a piano in the house if she so desired. She asked them when it would be there, and they replied, "On Friday." She said, "All right." Friday morning they took the piano to the house, and found defendant's wife absent. They went to one of the neighbors, and found the key of the house, and the neighbor went over and unlocked the house. They put the piano in the house, where it has remained ever since. Mr. Grinnell and Mr. McGuinness, a few days afterwards, went to defendant's

house, and asked defendant's wife how Mr. Anderson liked the piano, and she answered by saying that her husband wanted to see them.   They tried to see the defendant, but were unable to do so until sometime in April.   They called at the house again on the 17th of February.   Mrs. Anderson was at the door, and would not let them in, and informed them that Mr. Anderson had said not to let any one in the house.   When Mr. Grinnell did see him, he says the following occurred:

" I asked him if I could sell him the piano, and he said, 'No.'   I then offered him $2, and told him, rather than to have any more trouble about it, I would give him $2, and take the piano, and let it go,—settle it; that I would do that, and pay him for any trouble he considered he was to.   I had two silver dollars there, and held it out to him.   He did not take it.   He didn't say much.   He just laughed at me when I offered it to him.   I asked him what he would take, and he said if I would give him $25 he would let me have the piano."

He says he was then told he could not have the piano, and must not go near the house.   After this he never made any request or demand for the piano.

It is the claim of defendant that plaintiffs saw the wife of defendant, and told her they had heard defendant wanted to buy a piano, and that she replied that she thought not, —that his preference was for an organ; that they then requested to put a piano in the house, as they wanted to put one in somewhere, and she told them, so far as she was concerned, she was willing, but they must see the defendant; that she had no further talk with them until her return home, when she found the piano in the house. The defendant is a conductor on a freight train, and is away from home a good deal.   His wife says, about two weeks after the piano came, the men came to the house, and inquired what Mr. Anderson thought about the piano, when she informed them he was displeased at the way it was put into the house; that he wanted to see them; that they came again in his absence, and said very unpleasant

things to her.   Defendant claims the first he saw of plaintiffs was two or three months after the piano was put in his house, when he had just been notified to take charge of a train; that at this time he had been informed of the conduct of the plaintiffs and their agent at his house, when the following occurred:

"I says: 'Gentlemen, I am called to go out.   I have got to go home, get my supper, get a lunch, and go out. I have no time to talk piano tonight.'   He says they would like to fix up the piano deal with me.   I says: 'You can't sell me the piano.   I never ordered one, don't want it, and have no time to talk with you on pianos tonight.' Mr. McGuinness says: 'There is this much about it: We have got your order for that piano.'   I says, 'You have got my order?'   I says, 'You haven't got anything of the kind,' or 'You can't show it.'   He says, 'We have your wife's order.'   I says, 'No; you can't show my wife's order for any piano.'   He says, 'Of course, we haven't a written order, but we have a verbal order from her for the piano.'   I says, 'You haven't got anything of the kind.'   I says, 'My wife never lied to me, that I ever found out, and I take it for granted she told me the truth in this case; and you never had anything of the kind, and you never had permission to put the piano in there.'"

Some hot words occurred between the parties, but he claims no demand was made upon him for the piano.   He says that at a subsequent talk with one of the plaintiffs the following occurred:

"I says, 'I am as ready to fix it up today as I ever will be.'   I says, 'I am willing to fix it.'   He says, 'As far as your trouble and bother is concerned, I am willing to pay you for the trouble we have put you to.'   I says, 'That is all I want.'   He went down in his pocket; offered me $2. I says, 'Mr. Grinnell, it don't look hardly large enough to me.'   I says: 'Of course, you might think it was all right, but I don't.   I don't think that would pay me for what trouble and bother I have been to.'   He says, 'What will satisfy you?'   I says, 'I haven't any itemized account figured up, but, if you want to jump accounts, give me $25 and I will be satisfied, or I will figure up itemized accounts and let it come to what it will.'   He didn't make

any reply particularly, any more than he says, 'Well,' he says, 'we will be good friends anyway.' He never made any demand of any description. I did not at that time refuse to deliver up the piano, or at any other time have I refused."

He claims that, just before the piano was taken to his house, he had graded his lawn, and that it was badly cut up by plaintiffs in putting the piano into the house, and that some injury was done to the porch and door-casing and carpet. He disavowed any claim of title to the piano, and said it was still where placed by the plaintiffs.

If we understand the argument of counsel, it is that the wife acted as the agent of the husband in allowing the piano to be placed in his house, and that it was his duty to repudiate her acts, and, failing to do so, he affirmed the agency of the wife; citing *Cooper* v. *Mulder*, 74 Mich. 374. They urge that Anderson, through the act of his wife, became a bailee, and that, when he refused to deliver possession of the property, this amounted to a conversion (citing Cooley, Torts [1st Ed.], 448), and that the tort might be waived and suit brought in *assumpsit* (citing *Newman* v. *Olney*, 118 Mich. 545, and other cases). We think counsel misapprehended the effect of the testimony. Giving it the most favorable construction possible, the piano did not come into the possession of the defendant by virtue of any agreement upon the part of either the wife or the husband to purchase it. The first time the plaintiffs spoke to the husband about buying the piano, he refused to do so. There is no testimony tending to show that he claimed to be the owner of it. It is true he refused to surrender possession of it until he was paid for his trouble, but that is the only way in which he refused to surrender its possession. He never converted it to his own use, and has never sold it for money or anything else. The rule is that, before a party can waive the tort and sue in *assumpsit* for the conversion of personal property, the tort feasor must have converted the property into money, or the relation existing between the parties must have had

its inception in contract. Neither of these situations existed in this case, and the judge might well have directed a verdict in favor of defendant. *Watson* v. *Stever*, 25 Mich. 386; *Tolan* v. *Hodgeboom*, 38 Mich. 624; *Tuttle* v. *Campbell*, 74 Mich. 652 (16 Am. St. Rep. 652).

Judgment is affirmed.

The other Justices concurred.